**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **DEBRA FRAZIER, LAVERNE VANN, SHAMAL BRYANT,** | **CIVIL ACTION** |
| **Plaintiffs,** | |
| **v.** | |
| | **NO. 17-5421** |
| **CITY OF PHILADELPHIA, CHIEF INSPECTOR ANTHONY BOYLE, RAYMOND EVERS AND JOHN DOES #1-100,** | |
| **Defendants.** | |

<u>**MEMORANDUM OPINION**</u>

In May 2017, Chief Inspector Anthony Boyle and Inspector Raymond Evers of the

Philadelphia Police Department's Narcotic Bureau ("the Individual Defendants") held a

department-wide meeting during which they discussed an investigation tactic known as

"flipping."  "Flipping" in this context refers to an arrangement between law enforcement and an

arrested person whereby the arrestee provides law enforcement with useful investigative

information in return for which the arrestee hopes to escape charges for the crime for which he or

she was arrested.  Plaintiffs, police officers Debra Frazier and Laverne Vann, attended the

meeting, believed they were being asked to do something illegal, and expressed those concerns

up the chain of command.  Officer Shamal Bryant, who is Frazier's administrative assistant, was

not at the meeting but says she got swept up in its aftermath.  Frazier, Vann and Bryant have

sued Boyle, Evers and the City of Philadelphia asserting that Defendants retaliated against them

for challenging comments made by Boyle and Evers.  They allege violations of 42 U.S.C. § 1983

and of the Pennsylvania Whistleblower Law.  *See* 43 Pa. Stat. Ann. § 1421.  All Defendants

moved for summary judgment in their favor.

## I.    FACTS

The dispute underlying this lawsuit began at a department-wide meeting of the Narcotics Bureau.  The parties have very different recollections of the meeting.  Defendants Boyle and Evers say they held the meeting shortly after they were assigned as the new leaders of the Narcotics Bureau to introduce themselves, review the expectations for their divisions, and receive input from members of the Bureau.  They recall discussing various issues pertaining to the integrity and effectiveness of investigations, the ability to get violent criminals off the street, and the arrest and prosecution of higher-level drug dealers.  They also recollect raising flipping, but contend it was simply a discussion about a common, legal method of developing information about criminal activity from arrested individuals whereby the arrestee becomes an informant.  Following the meeting, Boyle and Evers worked with lawyers within the Bureau and within the District Attorney's office to draft a formal policy on flipping.

Plaintiffs Frazier and Vann remember the flipping discussion very differently. They recall that during the meeting, the Individual Defendants ordered aggressive and illegal tactics— namely, that if someone was found with a small quantity of drugs, instead of arresting them, the officers were to simply record the drugs as an "investigation of objects" not attached to a specific person, then force the suspect to become an "informal informant" through unofficial channels. They also understood Defendants to be instructing officers to falsify property receipts tied to potential informal informants.  Specifically, when officers questioned Evers as to what to say on the property receipt and whether they were supposed to lie about the origin of the drugs on the receipt, Evers responded that "we will take care of it."  Further, they say that Boyle told officers to engage in aggressive policing tactics, such as forcefully clearing people off street corners and running over the feet of "toads and scumbags" if they would not move.

After the meeting, Frazier and Vann both reported their concerns up the chain of command: Frazier to First Deputy Commissioner Myron Patterson and Vann to Deputy Commissioner Dennis Wilson, as well as to Evers. They both describe how, following their reports, Defendants retaliated against them.

Frazier says she was excluded from meetings at which she should have been present; her office door locks were changed without prior notification to her and she was not given a key to the new lock; someone broke into her office (as evidenced by "jimmy" marks on the door and an askew light panel); Boyle nitpicked and made unnecessary corrections to her memos (for example to her use of parentheses); and he took his time forwarding her memos to Wilson which made it look like she was late in completing them. Further, when she requested a day off to make the arrangements for a relative's funeral service, Boyle denied her request on the grounds that funeral days could only be used on the date of the actual service. She contends that Boyle and Evers attempted to eliminate her position at a meeting where Boyle claimed that her job duplicated another officer's job when, in fact, it was "quite clear" that the two jobs were distinct. Ultimately, Frazier was transferred to a different department, the Audits and Inspections Unit, which is housed in an office roughly four miles further away from her home than her old office. And, according to Frazier, the office was makeshift, cramped, and barely habitable, without heat or air conditioning, equipment, and female bathrooms. She says she was also denied an individual office, which was required for her rank.

Like Frazier, Vann contends she was improperly excluded from meetings and that her reports were not forwarded by Boyle, making them appear to be late. In addition, she asserts she was subject to frivolous discipline; Boyle took her assigned marked police car and directed it for another officer's use; and he inappropriately whistled at her, as if she was a dog. She also

describes how—although she was not a proficient rider (and had explained that to her bosses)—she, unlike any other captain, was forced to participate in bike training during which she was severely injured and suffered heat exhaustion. Vann also contends that Evers attempted to have her transferred to a different bureau. Finally, she claims that after her deposition in this matter, Boyle physically assaulted her while she was handcuffing a suspect (actions for which she has filed a criminal complaint against him).

Bryant's claim is different than Frazier's and Vann's. She says she faced retaliation because she is Frazier's aide and because she complained that Boyle was violating the union contract with regard to overtime. Specifically, she complains that she was inappropriately denied overtime; that she was improperly subject to an Internal Affairs investigation related to an automobile accident report she wrote for Frazier; and that she was falsely accused (although not disciplined) for stealing a city computer.

In the midst of all of this, an anonymous letter dated July 30, 2017 and addressed "To Whom It May Concern, From Stressed Black Personnel of The Narcotics Bureau" circulated through the Narcotics Bureau. The memorandum raised many of the above-described complaints about the May bureau-wide meeting. It also alleged that African American supervisors and officers are held to different standards than white ones and cited perceived instances of discrimination against African American officers (including Frazier and Vann). According to the letter, the Narcotics Bureau, at the hands of Boyle and Evers, is a hostile work environment for African American employees. All Plaintiffs deny involvement with the letter. In response to the letter, the Police Department opened two parallel Internal Affairs Division (IAD) investigations. After extensive interviews with officers in the Narcotics Bureau, the IAD concluded that there was no support for the letters' allegations. The investigation did, however,

find that Evers implemented the new flipping program despite expressed discomfort from officers and that the policy directive which was cited as support for its use was too vague and insufficient to support it.

## II.     LEGAL STANDARDS

Summary judgment is appropriate only when "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). An issue is "genuine" if a reasonable jury could possibly hold in the non-moving party's favor on that issue. *Id.* In determining whether a genuine issue of material fact exists, "the facts and all reasonable inferences drawn from those facts" must be taken "in the light most favorable to the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the parties present credible, conflicting evidence and issues of credibility remain, summary judgment is not appropriate. *Losch v. Borough of Parkesburg, Pa.*, 736 F.2d 903, 908-09 (3d Cir. 1984).

## III.     FIRST AMENDMENT RETALIATION

To evaluate Plaintiffs' First Amendment retaliation claim under 42 U.S.C. § 1983, a three step analysis, known as the "*Pickering* balancing test," is required. *Green v. Phil. Hous. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997) (citing *Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968)).

The first step is whether the speech in question is protected speech? *Id.* The primary inquiry is whether it involves a "matter of public concern," meaning it is "fairly considered as relating to any matter of political, social or other concern to the community." *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001). For example, the speech is protected if it attempts to bring to light actual or potential wrongdoings on behalf of a public official or demonstrates a breach of public trust on behalf of the official. *Id.*

But there are some limitations as to what is considered protected speech. Specifically, airing of "merely personal grievances" is not of public concern. *Feldman v. Phil. Housing Auth.*, 43 F.3d 823, 829 (3d Cir. 1994). Further, an employee of a public entity is not protected "when [they] make statements pursuant to their official duties." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Only if they speak as a private citizen is their speech protected by the First Amendment. So, for example, an employee whose "primary purpose is to bring about systemic reform" is more likely speaking as a citizen. *Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 979 (3d Cir. 1997). Whether a particular statement was made as part of a public plaintiff's duties (and thus not protected) or as a private citizen (and thus protected), is a mixed question of fact and law; the scope of job duties is fact-based, but the ultimate constitutional significance of those facts is a question of law. *Flora v. Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015).

Determining on which side of the line speech falls involves a "'practical' inquiry" into whether an employee is speaking within their job duties, looking at, among other things, whether the employee's speech relates to special knowledge acquired on the job; whether the employee raises complaints about issues related to her job "up the chain of command;" whether the speech was within the employee's designated responsibilities; and whether the speech is in furtherance of designated duties, even if the speech is not formally part of them. *Kimmett v. Corbett*, 554 F. App'x 106, 111 (3d Cir. 2014). That the views are expressed inside the workplace or touch on the subject matter of the employee's job is not dispositive. *Garcetti*, 547 U.S. at 420-21.

The second question in the analysis is whether plaintiff's interest in the speech "outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees." *Id.* at 413. A balance is struck between the employee's interest in free speech, and the state's countervailing interest as an employer to

promote efficiency in its service.  *Brennan v. Norton*, 350 F.3d 399, 413 (3d Cir. 2003).  Thus, if an employee engages in speech that is highly disruptive to the workplace, making it difficult for the public entity to run an efficient office, then this weighs against protecting the speech.  The significance of the speech's impact on the entity's interest in running an efficient workplace turns on the relationship between the employer and employee.  The interest is particularly strong when the employee's position requires a high degree of trust between herself and the supervisor, and the speech at issue erodes that trust—and therefore erodes the working relationship.  *Id.* Nonetheless, the presumption in favor of free speech is strong.  A mere showing of a disruption is not, standing alone, enough to determine that the employee's speech is not protected. *Swineford v. Snyder Cty.*, 15 F.3d 1258, 1272 (3d Cir. 1994).

The third step of the analysis is a determination of whether the "protected activity . . . [was] a substantial or motivating factor in the alleged retaliatory action."  *Brennan*, 350 F.3d at 414.  The key question is whether the retaliatory act would "deter a person of ordinary firmness from exercising his or her First Amendment rights."  *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000) (internal quotation omitted).  Generally, making the causal connection between the protected speech and the alleged retaliation requires showing either an "unusually suggestive" temporal proximity between the two, or a "pattern of antagonism" combined with timing. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).  Actual or constructive discharge is not required: "[T]he constitutional violation is not in the harshness of the sanction applied, but in the imposition of any disciplinary action for the exercise of permissible free speech."  *Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir. 1987).  On the other hand, not all negative actions rise to the level of actionable retaliation.  For example, mere criticism, false accusations, or verbal reprimands are unlikely to qualify.  *Brennan*, 350 F.3d at 419.  The

cumulative effects, however, of what might otherwise seem trivial, could become actionable even if the actions in isolation would not be. *Id.* at 422 n.17.

In this case, there are three Plaintiffs and three Defendants and each Plaintiff must adduce sufficient evidence that each Defendant, independently, acted in a retaliatory manner. *Brennan*, 350 F.3d at 419; *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) ("It is elementary that a defendant in a civil rights action must have personal involvement in the alleged wrongdoing."). If Plaintiffs make all three showings, summary judgment is not appropriate.

## A. Frazier's Retaliation Case

### 1. Public Significance

As stated, Frazier asserts that Defendants Evers and Boyle instructed officers to perform the common police tactic of flipping suspects in an illegal manner—namely, that they encouraged officers to falsify property records and not go through the proper channels to turn the suspects into confidential informants. Defendants vehemently deny Plaintiff's recounting of the meeting. There is no audio recording or official notes in the record from the meeting. But the extensive interviews taken during the IAD Investigation indicate that flipping was discussed and that numerous officers expressed discomfort with Defendants' proposals. It follows from the conflicting accounts that there is an issue of fact as to whether members of the Philadelphia Police Department were proposing using illegal investigative tactics. If such illegal tactics were found to have been proposed, then reporting the behavior can be said to "bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." *Baldassare*, 250 F.3d at 195.

Whether Frazier spoke as a private citizen, and not just an employee, is a closer question. Frazier was the Integrity Control officer of the Narcotics Bureau. She, as well as Boyle and

Evers, describe her primary job as being in charge of the integrity of paperwork (such as reports and memos filed by officers) and reviewing paperwork for accuracy. Accordingly, her duties were unlikely to involve flipping an arrestee. *See Kimmett*, 554 F. App'x at 111 (looking to whether the speech was part of or in furtherance of designated duties). She did, however, view herself as responsible for reporting any policy violation and believed that the flipping discussion at the meeting involved such a violation in that she understood it to mean other officers were being required to engage in illegal activity and subvert official channels for informants.

That does not, however, end the inquiry. She asserts, in an affidavit attached to the motion for summary judgment, that she reported her concerns up the chain of command, but that she also raised them with the Vice President of the Fraternal Order of Police and the President of the Guardian Civil League, which is the Philadelphia chapter of the National Black Police Association—neither of whom are in her chain of command.

***

The affidavit requires a short detour in the analysis of Frazier's claims in that the Defendants urge the Court to ignore it as a "sham" produced solely for the purpose of avoiding summary judgment. As a preliminary matter, a party is permitted to submit an affidavit in opposition to summary judgment so long as it "shall be made on personal knowledge, shall set forth such facts that would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(c)(4). The sham affidavit doctrine comes into play if a party proposes, in a new affidavit, "substantive changes that materially contradict prior deposition testimony." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 268 (3d Cir. 2010).[1] The content of the affidavit is critical in determining whether it is

---

[1] This case involved an errata sheet correcting a deposition transcript, not an affidavit. However, the court held that the same analysis applies in both the errata and affidavit context. *Id.* at 270.

a "sham" or not. For example, "conclusory, self-serving affidavits are . . . insufficient to withstand a motion for summary judgment." *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002). Further, a party cannot create a material issue of fact simply by "filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004). But at the same time, if an affidavit contains some degree of discrepancy from a former statement it is not necessarily disregarded. *See id.* If there is a plausible explanation for the contradictory statements, or independent record evidence of the new statement, there may be reason to consider it. *EBC, Inc.*, 618 F.3d at 268-69.

Frazier's affidavit does contain some new information, not mentioned in her deposition, *i.e.*, that she raised her concern about the flipping discussion with the Fraternal Order of Police and the Guardian Civic League, but the information does not contradict her deposition testimony or any other evidence in the summary judgment record. Specifically, at her deposition, she was asked who she reported her concerns to, and she answered Deputy Commissioner Patterson. Defense counsel then asked a series of follow-up questions related to her answer but did not ask if she reported elsewhere. Later in the deposition, she was asked whether, after reporting to Patterson, she ever complained "up the chain of command again," to which she said no. Defense counsel could have asked whether she raised her concerns with anyone outside the Police Department but did not. Her inclusion of that information in her affidavit does not contradict her deposition testimony and, thus, consideration of it is not precluded by the sham affidavit doctrine.

***

There is no record evidence that Frazier's job duties required her to report to a fraternal organization or her union. Such reporting did not fall within her job duties and, thus, in raising her concerns with them, she was speaking as a private citizen and her speech was protected. *See Flora*, 776 F.3d at 180 (plaintiff who initially took his complaints "up the chain of command," then took additional measures outside his chain of command engaged in protected speech).

### 2. Balancing

Whether Frazier's interest in her speech outweighs her employer's countervailing interest in promoting efficiency, *Brennan*, 350 F.3d at 413, is not addressed by any party in their briefs. The record reflects that, at most, a few officers reported in their IAD interviews that the allegations of racism and misconduct created some general feelings of tension within the Bureau—but most cited specifically the Anonymous Letter as the cause of tension, not Plaintiffs' protests against the flipping policy. Balanced against potential tension within the Bureau is the high level of importance of speech that may bring police misconduct to the attention of the public and to other officers in the Bureau. The weight of the balance is in Frazier's favor.

### 3. Retaliation

Frazier finally must show specific retaliatory actions taken by each Defendant separately; it is not enough to show there were collective or unattributable actions. *Evancho*, 423 F.3d at 353.

#### i. Defendant Evers

Frazier was not in Evers' chain of command; she reported directly to Boyle. And the evidence specific to Evers is spare. Frazier claims that Evers was at a meeting with her, Boyle, and Wilson a month after she first reported her complaints, during which Boyle attempted to have her position cut. But Frazier does not claim Evers played any role in that effort. And while

Frazier makes other general assertions of wrongdoing, including that she was transferred and improperly excluded from meetings, she again does not present evidence to tie this conduct to Evers. *See Brennan*, 350 F.3d at 419 (requiring evidence of wrongdoing by the specific defendant at issue). Because Frazier has not presented any evidence showing that Evers retaliated against her; summary judgment will be granted on this claim.

      ii.    <u>Defendant Boyle</u>

The evidence that Boyle retaliated against Frazier, when taken in its entirety, raises genuine issues of material fact,[2] in that the jury, when viewing the evidence as a whole, could reasonably find that Boyle engaged in a "pattern of antagonism" against Frazier. *DeFlaminis*, 480 F.3d at 267. Frazier asserts that Boyle: became enraged when she reported that her office was broken into; transferred her to a ramshackle office four miles further away from her home than her old office resulting in an increase in her commute time; nitpicked her reports; delayed sending her reports to Wilson; and improperly denied her a funeral day.

While evidence conclusively tying Boyle to the break-in is lacking, as the investigation of her office did not turn up any fingerprints, a jury could find Boyle's alleged angered response telling. *See Losch*, 736 F.2d at 908. Transfers to another office that increase commute time too can be construed as retaliation. *See Rutan v. Republican Party*, 497 U.S. 62, 73 (1990). Although there is no direct evidence that Boyle ordered the transfer and he denies that he has authority to initiate a transfer, he does acknowledge that he has the "power to request transfer." While close timing is generally more indicative of causation, the ten months gap between the report and the transfer is not dispositive. *See Brennan*, 350 F.3d at 420 (holding that a nine-

---

[2] One incident Frazier points to is Boyle having the locks changed on her door and not giving her a key. While Boyle did do this, he explained that he changed the locks on all doors so he had a master key. Frazier does not deny this explanation, so the lock changing does not support her claim of retaliation.

month gap between the expression and alleged retaliation is not, "by itself, sufficient to preclude an inference of causation"). And, although criticism and verbal reprimands such as nitpicking and delaying sending reports, are generally not sufficient to qualify as retaliatory, *see id.* at 419, what in isolation may seem trivial can rise to the level of retaliation when viewed in the context of all other events. *Id.* at 422 n.17. Finally, Boyle contends the funeral day denial was proper because a funeral day can only be used for the day of the service itself. Neither side introduced any written policy regarding funeral days. Thus, it is Frazier's word against Boyle's word—and who is to be believed is a matter for the jury.

Taking all inferences in Frazier's favor, together the evidence she has presented could paint an image of repeated harassing behavior from Boyle after she reported his alleged misdoing. With fact issues and credibility concerns remaining, summary judgment on this claim is not appropriate.

## B. Plaintiff Vann's Retaliation Case

### 1. *Public Significance*

Vann reported the same behavior as Frazier. Her comments thus touched on issues of public significance for the same reasons as Frazier's did. *See supra* Part III.A.1. Vann serves as a Captain in the Narcotics Strike Force. As such she oversees other officers on the Force in on-the-street narcotics policing, work which often leads to warrants, searches and arrests. The flipping policy would thus potentially impact Vann's day-to-day job duties.

Although Vann did not identify reporting policy violations as part of her duties she, like Frazier, states in an affidavit that she reported the wrongdoing to the Guardian Civic League and the Fraternal Order of Police. Also like Frazier, she never mentioned either of these organizations in her deposition. She was asked in an open-ended question who she reported to,

and in follow up questions, she was asked if she talked to "anyone else above" her about

concerns, to which she responded no. There was no follow-up or question about whether she

spoke to anyone outside her chain of command. The failure to mention these organizations, thus,

does not "materially contradict prior deposition testimony." *EBC, Inc.*, 618 F.3d at 268. A

reasonable jury could find that raising concerns about a superior's command to two outside

entities goes beyond the scope of what would reasonably be expected of Vann in her work

duties, *see Flora*, 776 F.3d at 180 (holding that a plaintiff who took measures outside the chain

of command to report wrongdoing was not within his job duties), and that in doing so she was

speaking as a private citizen.

### 2. *Balancing*

Once again, no party specifically addressed the balancing component of a First

Amendment retaliation claim. But the same evidence exists for Vann as it did for Frazier. *See*

*supra* Part III.A.2. And, for the same reasons, the balance is struck in Vann's favor.

### 3. *Retaliation*

i. <u>Defendant Evers</u>

Vann, as a Captain in Narcotics Strike Force, reported directly to Evers and interacted

with him "pretty much on a daily basis." She says he retaliated against her by: improperly

excluding her from meetings to which, as a supervisor, she should have been invited; sending her

an improper "counseling memo" asserting her reports were tardy; planning, with Boyle to

"involuntarily transfer" her; and working with Boyle to give her an unsatisfactory performance

rating shortly after her deposition in this case.[3]

---

[3] Vann also alleges in her affidavit that she was subject to three frivolous sets of formal discipline. The discipline
came from the IAD and she does not tie their issuance to any specific defendant.

Vann was not actually transferred, nor does she provide any evidence beyond speculation that Evers attempted to make this happen. But her other allegations are more problematic. Vann specifically identifies at least four meetings from which other supervisors attended but she was excluded, including a subsequent, follow-up meeting regarding the flipping order. Such exclusions go beyond "criticism, false accusations, or verbal reprimands." *Brennan*, 350 F.3d at 419. A reasonable jury could find the exclusions significantly impeded Vann's ability to do her job within the Bureau. Counseling memos are not considered formal discipline under the Police Department's bargaining agreement; however, when combined with the other acts Vann alleges, they may contribute to a pattern of antagonism. *Id.* at 422 n.17. And finally, although the negative performance rating came quite a lengthy time after her initial report, its proximity in time to the deposition makes it more probative. *See DeFlaminis*, 480 F.3d at 267. Taken all together, this pattern of exclusions and negative reviews could be found to deter a person of "ordinary firmness" from exercising their constitutional rights. *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000).

        ii.     Defendant Boyle

Boyle, as the chief of the Narcotics Bureau, was the next person in Vann's chain of command after Evers. Vann alleges that Boyle: forced her to attend bike training even though she was not a skilled enough rider; began assigning her marked police car to another officer; tardily forwarded her memos to Wilson; whistled at her like she was a dog; excluded her from meetings at which she should have been present; and physically assaulted her.

According to Vann, Boyle repeatedly insisted she had to attend bike training—which would allow her to patrol as an officer on bike—despite her protestations that she did not know how to ride. This was, Vann claims, a highly unusual command to be given to a captain such as

herself.  The bike training program was challenging, involving, for example, obstacles such as jumping curbs and riding on steps.  During one of the early trainings, Vann was in a serious accident that required a trip to the hospital.  The accident report describes only heat exhaustion, which Boyle says shows that her accident was not related to her inability to ride a bike.  But Vann explains that her inexperience contributed to the exhaustion, as she was nervous and struggling with gear changes.  At the summary judgment stage, Vann presents credible evidence that she was too inexperienced to participate in bike training and that the order to do so only came only after she filed reports against Boyle.  A jury could find this compelling evidence of retaliation.

Assigning her marked car to a lower ranking officer, tardily forwarding her memos, and whistling at her like a dog could all further contribute to a pattern of antagonism.  *Brennan*, 350 F.3d 422 n.17.  While Boyle claims the whistle was a simple attempt to get her attention, IAD interviews reveal that other officers present found the whistling inappropriate too.  And as discussed, a jury could find excluding her from meetings at which she should have been present probative.  Finally, Vann alleges that the assault occurred less than two months after her deposition, that she reported it to numerous personnel, including Wilson, the Guardian Civil League, and the Fraternal Order of Police, and that she filed a criminal complaint.  While Boyle vehemently denies any assault occurred, whether it did or did not is a question of fact for the jury.  *Losch*, 736 F.2d at 908.  Taken together, Boyle's behavior could represent a repeated series of actions which a jury could conclude were retaliation.  *See Brennan*, 350 F.3d at 422 n.17.

## C.  Defendant Bryant

Unlike Vann and Frazier, Bryant was not present at the meeting where Defendants discussed the new flipping policy.  Although she learned about what happened from her

supervisor, Frazier, she herself never reported anything related to the meeting. Bryant thus makes no allegation that she engaged in any protected speech related to police misconduct. She claims that she was retaliated against because of her association with Frazier. But Bryant presents no evidence to support this claim other than the conclusory statements in her brief opposing summary judgment. A party cannot rely "merely upon bare assertions, conclusory allegations or suspicions" to overcome a motion for summary judgment. *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir. 1985). And in her deposition, Bryant herself identifies a different reason for why she was denied overtime: "I believe I received less overtime because I was the only black aide," a belief she reiterated more than once. She has not, however, in this matter raised a claim of race discrimination.

Bryant also contends she was retaliated against because she filed a union grievance about her lack of overtime. Some union activity, particularly related to organizing and bargaining, comes within the First Amendment's right to associate. *See Brennan*, 350 F.3d at 423 n.19. But Bryant's only union activity was filing a grievance with the primary goal of resolving her own personal issue. Speech pertaining to "merely personal grievances" does not receive First Amendment protection. *Feldman v. Phil. Housing Auth.*, 43 F.3d 823, 829 (3d Cir. 1994).[4] Summary judgment on Bryant's claims against both Evers and Boyle will be granted.

### D. Qualified immunity

Evers and Boyle argue that, even if they violated Frazier's and Vann's rights, they are protected by qualified immunity. Qualified immunity "insulate[s] government officials from

---

[4] Even if Bryant's speech related to a matter of concern, her evidence of retaliation is spare. Bryant had the most overall overtime between March and October of 2017, the months immediately following the meeting on flipping. And while Bryant argues that it needs to be broken down based on the type of overtime, Bryant led "Code 64" overtime and was fourth of seven in "Code 53." The other issues Bryant complains of, including a non-disciplinary counseling memo and a false allegation of theft that resulted in no formal action, also do not rise to the level of prohibited retaliation.

liability for assumable damages when the discretionary conduct of that official did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The goal of the doctrine is to give "ample room for mistakes of judgment in protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

In considering a claim for qualified immunity, all inferences must be taken in the plaintiff's favor and the evidence must establish that the official's conduct plausibly violated a constitutional right. *McGreevy v. Stroup*, 413 F.3d 359, 364 (3d Cir. 2005). The right allegedly violated must be "clearly established" and "about which a reasonable person would have known." *Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000). Generally speaking, a right is clearly established when its contours are sufficiently clear, such that a reasonable officer would understand that what he is doing violates that right. *McGreevy*, 413 F.3d at 366.

Evers argues that he did not engage in retaliatory conduct that would deter a person of ordinary firmness from exercising her rights, and thus he is protected by qualified immunity. But, as set forth above, Vann did present sufficient evidence from which a reasonable jury could conclude he behaved in precisely such a manner.

Boyle argues that, because he acted with the Philadelphia District Attorney's office and Police Department Legal Counsel's advice in drafting a flipping policy following the meeting, it was not clear to him that the policy violated the law. But the alleged violation at issue is not the legality of the flipping policy, it is that Boyle retaliated against Frazier and Vann for *reporting* that the policy was illegal. What thus matters is whether it was clearly established that a public official cannot retaliate against an employee who exercises her First Amendment rights. It was. The Third Circuit has long recognized that a public official cannot be retaliated against for

exercising her First Amendment rights. *Baldassare*, 250 F.3d at 201. *See also Bennis v. Gable*, 823 F.3d 723, 734 (3d Cir. 1987) ("[A]s of 1982 the law was 'clearly established' that a public employee could not be demoted in retaliation for exercising his rights under the first amendment."). And this is particularly the case when the "balance of cognizable interests" weighs heavily in the employee's favor. *McGreevy*, 413 F.3d at 367. As explained, *supra* Part III.A.2, B.2, the *Pickering* balance weighs strongly in Frazier's and Vann's favor given that reports of alleged police misconduct are of foremost public concern. And as detailed, there is a genuine issue of material fact as to whether Boyle (and Evers) engaged in a sustained pattern of harassing behavior, spanning over many instances and over many months. If the Defendants did what Plaintiffs say, their actions were knowing violations of the law and thus he is not protected by qualified immunity.

### E. Defendant City of Philadelphia

All three Plaintiffs also bring a First Amendment retaliation claim against the City of Philadelphia on the same grounds as their claims against the individual defendants. Bryant did not engage in protected speech, so she has no potential claim against the City. Although Frazier and Vann engaged in protected speech, they do not have a retaliation claim against the City.

A municipality may be liable if it violated a plaintiff's constitutional rights (1) through "a policy, ordinance, regulation or officially adopted decision that has been promulgated by the municipality's officers," (2) through action taken by an official with final policymaking authority, or (3) through "governmental custom even though such custom has not been formally approved." *Brennan*, 350 F.3d at 427; *McGreevy*, 413 F.3d at 367. Plaintiffs allege that liability arose through the City's acquiescence to the retaliation, thus constituting a custom.

A custom for municipal liability refers to a "a given course of conduct, although not specifically endorsed or authorized by law, [that] is so well-settled and permanent as virtually to constitute law." *Watson v. Abington Twp.*, 478 F.3d 144, 155-56 (3d Cir. 2007). To make such a claim, Plaintiffs must show that an official with final policy-making power is responsible for the City acquiescing to retaliation to such a degree that it constitutes a custom. *Id.*

Plaintiffs allege that Police Commissioner Richard Ross was aware of the alleged retaliation and failed to act on it, thereby acquiescing to its ongoing occurrence. No party disputes Ross is an official with final policymaking power. But they do dispute whether Ross had any knowledge of the retaliation. Frazier claims that, when she met with Patterson to discuss the illegal flipping, he told her he would report it up to Ross. Likewise, Vann says that when she met with Wilson, he said he would report it up. But even if both men reported the illegal flipping allegations to Ross, that does not mean he knew about the ensuing *retaliation*. Plaintiffs must show Ross acquiesced to the retaliatory actions, not the flipping policy.

They do claim that Ross did, in fact, acquiesce to retaliation because Vann and Frazier "repeatedly complained up the chain of command and to Internal Affairs that they were suffering retaliation." But neither of them directly reported to Ross, and Ross himself alleges that, while he heard about general "allegations of retaliation," he had not heard of any specific "instances of retaliation" against Plaintiffs. Ross also asserts that he did not look into any of the allegations himself because he knew the IAD investigation regarding the Anonymous Letter was taking a "holistic … look at the entire allegation," and when the IAD's conclusions were released, he relied on them.

No evidence in the record directly ties Ross to knowledge of Plaintiffs' specific retaliation claims other than Plaintiffs' speculation that others must have told him. *Robertson v.*

*Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) (noting that "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment"). Nor do Plaintiffs provide any evidence that the City's failure to properly handle retaliation allegations is so "well-settled and permanent as virtually to constitute law," especially in light of the two broad IAD investigations that began after the Anonymous Letter. *Watson*, 478 F.3d at 155-56. While the IAD report may have determined no retaliation occurred, by all accounts the investigation was thorough. Accordingly, summary judgment on this claim will be granted.

### F. Punitive Damages

Defendants seek to dismiss Plaintiffs' request for punitive damages. Although municipalities are immune from punitive damages in a Section 1983 suit, *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981), Plaintiffs could obtain punitive damages from the Individual Defendants pursuant to Section 1983 if their "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Retaliatory motive alone is insufficient to meet this threshold. *Brennan*, 350 F.3d at 430. But strong "circumstantial evidence" of retaliation combined with a "vindictive 'attitude'" towards a Plaintiff can be enough to sustain a punitive damages award. *Springer v. Henry*, 435 F.3d 268, 281-82 (3d Cir. 2006). Frazier alleges that Boyle, amongst other actions, retaliatorily denied her a funeral day following her aunt's death; improperly excluded her from meetings at which all other supervisors were present; and transferred her to a dilapidated office further from her home. Vann alleges that the Individual Defendants, amongst other actions, retaliatorily forced her to participate in a bike training where she got severely injured; issued her a negative performance review; and

whistled at her like a dog in front of her fellow officers.  Here, the record is sufficient to meet

that standard and, thus, the question of punitives remains in the case as it concerns the individual

defendants.

## IV.    PENNSYLVANIA WHISTLEBLOWER LAW

Plaintiffs also bring a claim for relief under Pennsylvania's Whistleblower Law, 43 Pa.

Stat. Ann. § 1421 *et seq.*, which provides in relevant part:

> No employer may discharge, threaten or otherwise discriminate or retaliate against
> an employee regarding the employee's compensation, terms, conditions, location
> or privileges of employment because the employee or a person acting on behalf of
> the employee makes a good faith report or is about to report, verbally or in writing,
> to the employer or appropriate authority an instance of wrongdoing or waste.

43 Pa. Stat. Ann. § 1423(a).  Recovery under the Act requires evidence that Plaintiffs: (1)

reported an instance of wrongdoing or waste to an appropriate authority; and (2) there is a causal

connection between the report and the alleged retaliation.  *Id.* § 1424(b).  If such a showing is

made, the burden shifts to the defendant to show that the action it took occurred for legitimate

reasons.  *Johnson v. Res. for Human Dev., Inc*., 789 F. Supp.2d 595, 601 (E.D. Pa. 2011).  The

burden then shifts back to the Plaintiff to show the proffered reason is, in fact, pretextual.

### A.  Reporting Wrongdoing

"Wrongdoing" under the statute is defined as a "violation which is not of a merely

technical or minimal nature of a Federal or State statute or regulation, of a political subdivision

ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the

public of the employer."  43 Pa. Stat. Ann. § 1422.  Frazier and Vann both reported that

Defendants—supervisors in the Philadelphia Police Department—were encouraging officers to

use illegal investigative tactics, falsify property receipts, and subvert official channels for

handling informants.  If true, this is not a technical or de minimis violation; this is instructing

officers to lie on official police records and hide evidence of crimes. While Defendants dispute Plaintiffs' account of the meeting and assert that their flipping policy was legal, what was really said at the meeting is a fact issue for the jury to decide.

Defendants argue Plaintiffs did not assert a clear enough violation to state a claim. It is true that an overly "general and vague" allegation of wrongdoing is not enough to state a claim. *Riggio v. Burns*, 711 A.2d 497, 501 (Pa. Super. 1998) (en banc). But the cases where plaintiffs have been found to not have clearly specified a violation primarily stem from instances where the underlying violation itself was too vague. For instance, in *Riggio*, the plaintiff cited to violations of health care codes that were "subject to interpretation, and [did] not specifically define prohibited conduct." *Id.* It was thus not sufficiently clear when and what violated the law. *See also Anderson v. Bd. of Sch. Dirs. of Millcreek Tp. Sch. Dist.*, 574 F. App'x 169, 174 (3d Cir. 2014) (finding that a provision of the Pennsylvania School Code that allowed removal for "immorality" too vague and subjective to serve as the basis of a whistleblower complaint).

Ultimately, all a Plaintiff must do is "demonstrate she made a report of some action by her employer or its agent, which, if proven, would constitute a violation of a law or regulation." *Greco v. Myers Coach Lines, Inc.*, 199 A.3d 426, 434 (Pa. Super. 2018). It simply must be "sufficient to identify the law [or regulation] allegedly violated." *Sukenik v. Twp. of Elizabeth*, 131 A.3d 550, 555 (Pa. Commw. 2016). Frazier's and Vann's reports provided sufficient information to identify allegations that officers were being told to illegally falsify evidence collected as part of an ongoing criminal investigation via property receipts. Further, Boyle allegedly told the division they were to begin implementing the policy immediately, so the violation was not hypothetical. Finally, other officers present at the meeting also expressed discomfort with the plan. That Plaintiffs did not cite the exact code number of the violation is

not fatal to their claim; it is self-evident that a police inspector directing his subordinate officers to illegally falsify evidence and lie on official documents constitutes wrongdoing. *Cf. O'Rourke v. Commonwealth*, 778 A.2d 1194, 1196 (Pa. 2001) (holding that plaintiff who reported coworkers and supervisors committed "theft and mismanagement" reported wrongdoing for purposes of the Whistleblower Law). Defendants were duly on notice of what Plaintiffs believed they did wrong. This satisfies the requirement that Plaintiffs make a good faith report of wrongdoing.

Plaintiff Bryant, however, is in a different situation. Bryant did not report any illegal practice. Filing a grievance regarding Union's bargained-for overtime practices is not a "Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public of the employer." 43 Pa. Stat. Ann. § 1422. And even were the grievance to be construed as reporting wrongdoing, the report also must be made without "consideration of personal benefit." *Id.* Bryant's primary purpose in filing her grievance was to attain more overtime for herself, a personal benefit. Summary judgment is thus appropriate on Bryant's Whistleblower claim.

**B. Causation**

Plaintiffs next must show that, following the report, their employer retaliated against them regarding the "compensation, terms, conditions, location or privileges of employment." 43 Pa. Stat. Ann. § 1423(a). "[C]oncrete facts" must connect the report and the retaliation. *Johnson*, 789 F. Supp.2d at 602. The alleged retaliatory actions taken against Plaintiffs have already been discussed in detail. *See supra* Part III.A.2; B.2.

As described, Frazier failed to show Evers retaliated against her. Vann, however, did make such a showing. She alleges, for example, that Evers gave her a negative performance

review following her deposition; excluded her from meetings at which all other supervisors attending, including a subsequent meeting on flipping; and sent her frivolous counselling memos. There is likewise ample evidence that Boyle may have impacted the conditions of both Plaintiffs' employment. For example, Frazier alleges she now lives further away from work than she used to and her reports are being forwarded late so as to make it look like she is not doing her job. Vann alleges that her workplace became a place where she felt physically unsafe around her supervisor and pressured into a bike training she was not qualified to undertake that resulted in serious injury. Both Plaintiffs presented enough evidence of retaliatory actions by Boyle to make a prima facie showing of causation.

Finally, the question remains whether the City of Philadelphia is potentially liable under the Whistleblower Law. Under the law, an "employer" can be an individual, partnership, association, or corporation. 43 Pa. Stat. Ann. § 1422. The City thus is a viable defendant. And unlike with Plaintiffs' federal claims, the state claims are not limited by *Monell*'s strict requirements for imposing supervisor liability. Although not explicitly addressed in the statute, traditional *respondeat superior* principles appear to apply, allowing an employer to be held liable for the actions of its employees. *See Scrip v. Seneca*, 191 A.3d 917, 920 n.4 (Pa. Commw. 2018) (noting that that the County was being sued under a theory of respondeat superior and dismissing the County on other grounds). In many cases brought under the Whistleblower Law, the public entity is in fact the only named defendant. *See Allen v. City of Philadelphia*, 2019 WL 1528538 (Pa. Commonw. Apr. 9, 2019) (City of Philadelphia Police Department); *Sukenik*, 131 A.3d 550 (township). Because Plaintiffs Frazier and Vann introduced evidence of a potentially viable Whistleblower claim by City of Philadelphia employees Evers and Boyle, their claim against the City also can move forward.

## C. Legitimate Reason for Actions

Under the Whistleblower Law's burden shifting framework, it is now upon Defendants to produce evidence of a legitimate, non-pretextual reason for its actions. *O'Rourke v. Dep't of Corrs.*, 778 A.2d 1194, 1200 (Pa. 2001). Evers and the City argue that they had legitimate, non-pretextual reasons for the alleged retaliatory actions of which Plaintiff's complain. For example, Defendants argue that Vann does not tie the negative performance review to any change in her work conditions. Further, Evers claims that either Vann was in fact invited to the meetings or that they were not meetings to which she would normally be invited. Issuing counseling memos, according to Evers, cannot be retaliatory because the memos are not formal discipline.

Boyle (and thus the city) likewise disputes or explains the alleged actions against both Plaintiffs. Defendants explain that the meeting regarding removing Frazier's job was simply an attempt by Boyle, who was new to the Bureau, to understand Frazier's role. Boyle both denies his ability to effectuate transfers and explains that all employees were being transferred out of the old building where Frazier used to work. Boyle denies that he or his staff broke into Frazier's office. He further explains that he "nitpicks" all memos and Frazier's included numerous errors. Finally, according to Boyle, he only denied Frazier's funeral day request because it was not in line with the City's policy.

As to Vann's primary complaint, the bike training, he explains that, at the outset, he never ordered Vann to undertake the training. Instead, Vann was enthusiastic about learning. Boyle explains that Vann in fact had access to two cars, an unmarked car that was hers to use and a marked police car. The marked car was not exclusively hers, and there was nothing retaliatory in allowing another officer to use the car. He also explains the whistling incident as a benign attempt to get Vann's attention. And finally, he vehemently denies any assault took place.

Ultimately, both sides have adduced sufficient evidence to meet their burden in the summary judgment context. The burden returns to Plaintiffs to show that the proffered reasons by Defendants are either not true or are pretext for retaliation. Making this determination will require assessments of credibility amongst competing narratives of events. These are quintessential issues for the jury.

## V. CONCLUSION

For the foregoing reasons, Defendant Evers' Motion to Dismiss will be granted in part and denied in part; Defendant Boyle's Motion to Dismiss will be denied; and Defendant City of Philadelphia's Motion to Dismiss will be granted in part and denied in part. An appropriate order follows.

**February 26, 2020**                                              **BY THE COURT:**


                                                                   **/s/Wendy Beetlestone, J.**

                                                                   _____
                                                                   **WENDY BEETLESTONE, J.**